Filed 12/3/14  P. v. Torres CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>RAYMOND MICHAEL TORRES et al.,<br><br>        Defendants and Appellants. | C068523<br><br>(Super. Ct. Nos. SF110419A<br>& SF110419B) |

As relevant to this appeal, a jury convicted brothers and codefendants Raymond and Vincent Torres[1] of carjacking, kidnapping to commit robbery, active participation in a criminal street gang, robbery, and attempted robbery.  The trial court sentenced

----

[1] Because defendants have the same last name, we refer to them by their first names for clarity.

1

Raymond to 30 years to life in prison for carjacking, life in prison with the possibility of parole for kidnapping to commit robbery, plus a determinate term of 22 years four months in prison. As for Vincent, the trial court sentenced him to 15 years to life in prison for carjacking, 15 years to life in prison for kidnapping to commit robbery, plus a determinate term of 25 years eight months in prison.[2]

We will discuss Vincent's appellate contentions in part I of our opinion, and Raymond's contentions in part II.

Vincent contends (A) he was denied effective assistance of counsel because his lawyer failed to offer an expert on the fallibility of eyewitness identification; (B) the trial court erred in the handling of a deadlocked jury; (C) the trial court erred in imposing a 10-year enhancement based on a finding that a principal personally used a firearm in committing one of the robberies; and (D) his 15-year-to-life sentence on the conviction for kidnapping to commit robbery should have been stayed pursuant to Penal Code section 654.

We will modify the judgment against Vincent to strike the 10-year enhancement for personal use of a firearm on count 4, and to stay the 15-year-to-life sentence on count 2 pursuant to Penal Code section 654. We will affirm the judgment against Vincent as modified.

Raymond contends (A) he should have been allowed to independently accept a plea agreement that was presented as a "package deal" to both brothers; (B) his punishment was cruel and unusual because he was a teenager at the time of the crimes;

---

[2] Although the parties apparently do not raise the issue, the abstracts of judgment appear to be incorrect in stating the total time. In addition, the abstract for Vincent's indeterminate sentence says certain enhancements on counts 1 and 2 are stayed, but the minute order says they are stricken. And Raymond's abstract incorrectly says the sentence of eight months on count 3 is stayed.

2

(C) some of his sentences should have been stayed; and (D) there was insufficient evidence to convict him of aiding and abetting the robbery charged in count 4.

We will modify the judgment against Raymond to stay the following sentences pursuant to Penal Code section 654: the sentence of life with the possibility of parole on count 2, the sentence of eight months on count 3 (which the abstract incorrectly indicates is stayed), the sentence of one year on count 5, and the sentence of four months on count 6. We will affirm the judgment against Raymond as modified.

BACKGROUND

On the night of December 11, 2008, Marco Serrano and his girlfriend, Yesenia Andrade, were seated in Serrano's car in a Stockton parking lot. Serrano was in the driver's seat and Andrade was in the front passenger seat. Their friend, Sergio Morales, was in the backseat. They were waiting to meet up with Serrano's friend Jesse P.

A Hispanic man knocked on the driver's window to ask for a light. The man was wearing a dark hooded sweatshirt with the hood up, and a "rag" (a handkerchief or bandana) partly covering his tattooed face. When Serrano lowered the window, the masked man brandished a gun and forced his way into the seat behind the driver. A second man, who had been standing behind the gunman, entered the front passenger seat, forcing Andrade into the back.

Moments later, when Serrano's friend Jesse walked up to the car, the gunman confronted him. Jesse testified that the gunman, who had a "red rag" over his nose and mouth, took $20 from the pocket of Jesse's sweatshirt before sending him away. Jesse returned to his brother's car and they called police.

Meanwhile, the gunman told Serrano to drive and demanded that Morales and Andrade turn over their money; they had none.

Police officers, responding to a dispatch, stopped the car a few minutes later. The officers saw two men run from the vehicle; one escaped, but officers chased and

3

apprehended the other, eventually identifying him as Raymond. Raymond was wearing a bandana around his neck and had Serrano's cell phone in his pocket.

Several days later, a detective met with Andrade and Serrano. Andrade reported that the suspect who escaped had facial tattoos. The detective showed her a photographic lineup of approximately 60 local men with facial tattoos. Andrade identified Vincent as the gunman; his cheeks were emblazoned with large numerals "1" and "4." Variants of the number 14 represent the letter "N" for "Norteño." An expert testified that, in the local community, a majority of people would have recognized the symbol on Vincent's face and understood its "intimidation factor." Morales told a detective the suspect had "14" on his face and identified Vincent from a photographic display.

Vincent was arrested at the courthouse a month later, while attending a hearing for Raymond. He tried to escape, breaking a window with a chair, but he was restrained during a struggle with police officers. At trial, he admitted being a gang member, admitted that gang members get respect by committing crimes, and also admitted that he was a "runner," someone who jumped off roofs, out of windows and away from cars to avoid police. In addition, he admitted "d[oing] time" for fighting, stealing cars and other crimes, but he denied any role in the crimes for which he was charged, saying carjacking was "out of [his] league."

Raymond and Vincent were tried together for the charged offenses. At trial, Morales positively identified both defendants. Raymond said he was involved in the crimes only because another armed gang member forced him to participate. Andrade, crying, said she was frightened and did not want to testify. She denied her earlier identifications but admitted that she told police the truth when the facts were fresh in her mind. Jesse also denied an identification he made on the night of the crime, insisting he saw only a red rag covering most of a face while a gun touched his head.

4

A jury convicted both defendants of carjacking (Penal Code, § 215, subd. (a) --
count 1);[3] kidnapping to commit robbery (§ 209, subd. (b) -- count 2); participation in a
criminal street gang (§ 186.22, subd. (a) -- count 3); second degree robbery of Jesse
(§ 211 -- count 4); second degree robbery of Serrano (§ 211 -- count 5); and attempted
second degree robbery of Andrade (§§ 211, 664 -- count 6).  The jury further found that,
as to the counts other than count 3, the crimes were for the benefit of a criminal street
gang (§ 186.22, subd. (b)(1)) and a principal personally used a firearm in commission of
the crimes (§ 12022.53, subd. (b)(e)), although there was no finding that either of the
defendants personally used a firearm.  Vincent was convicted of additional counts not at
issue in this appeal, such as vandalism, escape and resisting arrest.

The trial court sentenced Raymond to 30 years to life in prison for carjacking, life
in prison with the possibility of parole for kidnapping to commit robbery, plus a
determinate term of 22 years four months in prison.  As for Vincent, the trial court
sentenced him to 15 years to life in prison for carjacking, 15 years to life in prison for
kidnapping to commit robbery, plus a determinate term of 25 years eight months in
prison.

Additional facts are included in the discussion as relevant to the contentions on
appeal.

## DISCUSSION

### I

### A

Vincent contends he was denied effective assistance of counsel because his lawyer
failed to offer an expert on the fallibility of eyewitness identification.

---

**3** Undesignated statutory references are to the Penal Code.

5

A criminal defendant has the right to effective assistance of counsel under the Sixth Amendment to the United States Constitution and also under article I, section 15 of the California Constitution; a defendant is entitled to the " 'reasonably competent assistance of an attorney acting as his diligent and conscientious advocate.' " (*In re Gay* (1998) 19 Cal.4th 771, 789-790.)  A diligent and conscientious advocate is one who makes rational and informed decisions on strategy and tactics, based on adequate investigation and preparation. (*Id*. at p. 790.)  To establish a claim that this right was denied, a defendant must show that his attorney made errors so serious that he did not serve the function of counsel and also that the deficiency prejudiced the defense so much that the defendant was deprived of a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)  Unless the defendant proves this, a reviewing court presumes that counsel performed within a range of professional competence. (*Ibid*.) "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8 [157 L.Ed.2d 1, 9].)

Vincent told the trial court in a *Marsden*[4] hearing that he wanted an identification expert and that his lawyer had disagreed.  Vincent's lawyer explained that he had been defending criminal defendants for 12 years and had used identification experts but, in this case, he believed an expert was not in Vincent's best interest.  He went on to explain to the trial court that he was ready for trial and he knew none of the witnesses had mentioned the tattoo on the night of the crime, so he did not need an identification expert to point out the flaws in their subsequent identifications or the suggestive nature of the photographic displays.  He had determined that the critical issues were "not [in] the realm

---

**4** *People v. Marsden* (1970) 2 Cal.3d 118.

of an ID expert." This colloquy demonstrates that the decision not to engage an expert was a rational and informed one, made after investigation and preparation.

At trial, Vincent's lawyer impeached the testimony of the eyewitnesses on cross-examination and again in closing argument, emphasizing the significance of CALCRIM No. 315 and the instruction on eyewitness identification, and pointing out inconsistencies and evidence that each of the witnesses was impaired, mistaken and/or biased. Vincent's attorney also pointed out demonstrably false testimony by the eyewitnesses and emphasized the instruction that when a witness has been "willfully false in one part of their testimony, you can disregard [or discount] the whole of their testimony." He argued that on the night of the crime all the witnesses who saw the gunman described his clothing consistently but none identified Vincent or mentioned his distinctive facial tattoos to police. This record demonstrates reasonably competent assistance by a diligent and conscientious advocate.

Vincent does not identify anything an expert might have said to further challenge the eyewitness testimony. We may not second-guess a tactical decision about whether to put on a particular witness unless it is apparent that the decision stemmed from an unreasonable failure to investigate. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1059.) Vincent's counsel was aware of the significance of witness identification issues when he made a tactical decision to attack witness credibility directly by impeachment and argument rather than through the testimony of an expert. A claim for ineffective assistance of counsel fails when it is based on a rational choice among legitimate trial tactics. (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

Cases cited by Vincent about errors in the exclusion of expert testimony are inapposite because the trial court did not exclude testimony. Vincent's lawyer chose not to offer the testimony and, as we have said, that choice did not demonstrate ineffective assistance of counsel.

B

Vincent further contends the trial court erred in the handling of a deadlocked jury. He claims the trial court deprived him of a fair trial and due process by directing the jury to continue deliberations under circumstances he describes as "coercive."

Deliberations commenced on April 22, 2011. At noon on April 27, jurors sent a note to the trial court saying, "We have 6 jurors who cannot place Vincent at the crime [scene] beyond a shadow of a doubt. We have worked on this for about 6 hours and cannot move forward. [¶] We have agreed on all counts regarding Raymond."

An hour and a half later, apparently following a lunch break, they sent another note saying, "In regards to Vincent -- if we cannot determine beyond a shadow of a doubt his presence in counts 1, 2, 4, 5 & 6 -- can we then rule on his participation in a street gang as set forth in count 3?" The trial court promptly responded by telling jurors they appeared not to be applying the correct burden of proof and that "[p]roof beyond a shadow of a doubt is not the correct burden of proof." The trial court directed jurors to the correct page in their jury instruction packets and read to them the instructions on the burden of proof.

The following afternoon, on April 28, the jury wrote to the judge saying, "We are unable to reach a unanimous decision on several counts. . . ." The trial court called the jurors into the courtroom and told them it would confer with counsel and then ask them questions the next morning, when defendants and counsel could be present.

On the morning of April 29, the trial court inquired of the jurors in writing, "Are you yet unable to reach a unanimous decision on several counts? Have you reached verdicts on other counts?" The foreperson wrote back on the same page, "We cannot agree that 1 suspect was there. One juror is holding out."

After bringing the jurors back into the courtroom, the trial court asked whether further deliberation, instruction from the trial court or the reading of testimony could assist the jurors on the remaining counts. The foreperson said no, but when the jurors

8

were polled, the sixth juror responded, "Instruction from the Court."  At that point, the trial court sent the jurors back to the deliberation room, directing them to "set out in writing what area you believe further instruction could be of assistance."  The jurors did not identify an area for further instruction but instead reached a verdict.  It found Vincent guilty on all counts.

When there is a jury impasse, a trial court "must at least consider how it can best aid the jury."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97, italics omitted.)  The trial court "should ask the jury if it has specific concerns which, if resolved, might assist the jury in reaching a verdict," and it may thereafter give additional instructions, clarify previous instructions and/or permit additional closing argument.  (Cal. Rules of Court, rule 2.1036.)

A jury may be discharged if "it satisfactorily appears that there is no reasonable probability that the jury can agree."  (Pen. Code, § 1140.)  Determining whether there is a reasonable probability of agreement rests within the sound discretion of the trial court.  (*People v. Harris* (2005) 37 Cal.4th 310, 363.)  The trial court may direct further deliberations to enhance the jury's understanding of the case but not as a means of pressuring it to reach a verdict on issues it already has discussed and considered.  (*Id.* at p. 364.)

A defendant's right to a fair trial may be violated if a trial judge's inquiry into jury balloting is "likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision."  (*Locks v. Sumner* (1983) 703 F.2d 403, 406.)  The issue of coercion must be viewed in context.  (*Ibid*.)  In other words, a trial court must not displace a jury's independent judgment in favor of " ' "compromise and expediency." ' " (*People v. Sheldon* (1989) 48 Cal.3d 935, 959.)  When a trial court knows there is "a single holdout juror favoring acquittal," remarks about the clarity of the evidence, the simplicity of the case, the necessity of reaching a unanimous verdict or the threat of being sequestered overnight could be considered coercive.  (*Id.* at pp. 959-960.)

9

Vincent claims the trial court should have done something different because the jury revealed there was one juror holding out. We conclude, however, that there was no abuse of discretion and, thus, no error. The trial court's query to the jury was appropriate under California rules of Court, rule 2.1036, and following up on a juror request for further instruction by asking that the instructional issue be reduced to writing was not inherently likely to put undue pressure on the holdout juror. The trial court did not ask the jury to deliberate further at that point.

Vincent cites *People v. Valdez* (2012) 55 Cal.4th 82, 164, arguing that the trial court should have directed the jurors not to compromise for the purpose of reaching a verdict. But the trial court previously instructed the jurors with the following directions, among others: "Each of you must decide the case for yourself . . . . [¶] Do not hesitate to change your mind if you become convinced that you are wrong, but do not change your mind just because other jurors disagree with you." (CALCRIM No. 3550.) Although *Valdez* referenced additional language from another pattern jury instruction in the context of a harmless error analysis, it did not prescribe what a trial court should say to a deadlocked jury. (*Valdez, supra,* 55 Cal.4th at p. 164.)

Here, the trial court sent the jury out to identify an instructional issue that at least one juror believed might break the impasse; the trial court did not comment on the deadlock. We need not speculate on whether a holdout juror "caved," as Vincent puts it, to avoid the "lengthy, potentially painful process of further instruction," or "fruitless deliberation." There is no evidence that the trial court coerced a holdout juror or that Vincent's right to a fair trial was abridged by the way the deadlock was handled.

C

Vincent also claims the trial court erred in imposing a 10-year enhancement based on a finding that a principal personally used a firearm in committing one of the robberies.

The trial court sentenced Vincent to three years for the robbery of Jesse, plus two 10-year enhancements based on findings that the robbery was committed for the benefit

10

of a criminal street gang and that a principal personally used a firearm. Vincent contends the trial court erred in imposing the enhancement for personal use of a firearm because although the jury found that a "principal" personally used a firearm, there was no finding that defendant personally used a firearm in committing the robbery. The Attorney General agrees, and so do we.

A gang member may not be subjected to both an enhancement for use of a firearm and the additional punishment authorized for crimes benefiting a criminal street gang unless he personally used the firearm. (*People v. Brookfield* (2009) 47 Cal.4th 583, 593; § 12022.53, subd. (e).) Here, the information alleged, and the jury found, merely that "a principal" used a firearm in the robbery of Jesse. Pursuant to *Brookfield*, *supra*, 47 Cal.4th at page 593, the trial court should not have sentenced Vincent to a 10-year enhancement for personal use of a firearm on count 4. We will modify the judgment to strike the enhancement.

D

In addition, Vincent argues his 15-year-to-life sentence on the conviction for kidnapping to commit robbery should have been stayed pursuant to section 654.

Among other things, the jury convicted Vincent of carjacking (§ 215, subd. (a) -- count 1) and kidnapping to commit robbery (§ 209, subd. (b) -- count 2). The trial court imposed consecutive sentences of 15 years to life in prison for carjacking and 15 years to life in prison for kidnapping to commit robbery. Vincent contends the crimes were incidental to, and the means of accomplishing, a single objective, so the life sentence for kidnapping to commit robbery should have been stayed.

Section 215, subdivision (c) provides that a person may be charged with robbery and carjacking for the same conduct but may not be punished for both. (*People v. Ortega* (1998) 19 Cal.4th 686, 700.) In addition, section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest

11

potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." If two offenses were incidental to a single objective, only one sentence may be imposed. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.) A trial court's express or implied finding that separately punished crimes involved separate objectives will be upheld on appeal if supported by substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

In this case, the trial court noted that section 654 required a stay of Vincent's sentences for the robbery of Serrano and attempted robbery of Andrade (counts 5 and 6) because they were incidental to the kidnapping to commit robbery. It did not say the same about the carjacking and kidnapping to commit robbery convictions.

The prosecutor argued that the carjacking was primarily against property and the kidnapping to commit robbery was against the people occupying the car. But carjacking is a crime against a driver and passengers, making it "more nearly a crime against the person than a crime against property." (*People v. Hill* (2000) 23 Cal.4th 853, 860.) When an occupied car is stolen, all the car's occupants are subjected to violence and risk and all suffer a loss of transportation, so all are properly deemed victims of the carjacking. (*People v. Coryell* (2003) 110 Cal.App.4th 1299, 1304.) Distinguishing between property and persons was not sufficient to warrant separate sentences.

The Attorney General urges a temporal distinction, claiming the carjacking happened when Vincent held the gun to Serrano's head and told him to drive, while the kidnapping to commit robbery happened when Vincent demanded money from the car's occupants and when Raymond picked up Serrano's cell phone. This temporal distinction is also unavailing. If we were to assume that defendants did not consider robbing the victims until after they had accomplished the kidnapping, the kidnapping to commit robbery conviction could not stand. Moreover, even if one crime is technically complete before another began, and even if there are multiple victims in a property-crime context, multiple punishments are precluded if there is but one course of conduct. (*People v.*

12

*Bauer* (1969) 1 Cal.3d 368, 376.)  The divisibility of a course of conduct depends on the actor's intent and objective.  (*Ibid.*)  Defendants' apparent intent here was to terrorize on behalf of the Norteños by commandeering the car and escaping with loot.  Except for the intervening and separate robbery of Jesse, there is no evidence of more than one single course of conduct.

In *People v. Perez* (2000) 84 Cal.App.4th 856, 859, 862, the defendant demanded cash and eventually took the victim's watch.  The defendant was convicted of both carjacking and kidnapping to commit robbery, but only a single sentence was permitted for those convictions.  (*Ibid.*)  The same was true in *People v. McKinzie* (2012) 54 Cal.4th 1302, 1369.  In *People v. Dominguez* (1995) 38 Cal.App.4th 410, 420, carjacking and robbery convictions were subject to a single sentence.  And in another carjacking case, a defendant took the driver's car keys and the passenger's purse, resulting in two convictions but one sentence.  (*People v. Hamilton* (1995) 40 Cal.App.4th 1137, 1142, fn. 4.)

Pursuant to section 654, we will modify the judgment to stay the 15-year-to-life sentence on Vincent's count 2 conviction for kidnapping to commit robbery.  (See *People v. Dominguez, supra,* 38 Cal.App.4th at p. 420.)

II

A

Raymond contends he should have been allowed to independently accept a plea offer that was presented as a "package deal" to both brothers.

Before trial, the prosecutor offered a package plea deal by which Raymond could have agreed to plead guilty in exchange for a prison sentence of 19 years, but only if Vincent also accepted the deal.  Raymond tried to accept, but the offer was withdrawn because Vincent refused it.

13

Raymond describes the plea negotiation as a coercive attempt to turn brother against brother in violation of public policy and due process.[5] He also describes it as precluding the reasonable exercise of his fundamental right to enter a guilty plea. He asks this court to remand the matter and require the trial court to provide an option for Raymond to accept the last plea offer as a remedy for the violation.

Regarding his asserted right to enter a guilty plea, it is well established that a criminal defendant may plead guilty rather than submitting to trial by jury. (*People v. Noll* (1862) 20 Cal. 164, 165.) Nothing prevented Raymond from entering an unconditional guilty plea. But that is not what Raymond wanted; he wanted to plead guilty on terms that the People did not offer or accept. Because a deal was not reached, Raymond pleaded not guilty, denied enhancement allegations, and denied responsibility for his actions at trial, claiming to have been drunk when an unidentified Norteño forced him to go along with the carjacking. Raymond, however, was not denied the opportunity to plead guilty.

As for due process, a guilty plea violates due process if it is obtained by coercion, and a package offer, although not coercive per se, "may . . . be so upon an examination of the totality of the circumstances." (*In re Ibarra* (1983) 34 Cal.3d 277, 286-287 (*Ibarra*), abrogated on other grounds in *People v. Mosby* (2004) 33 Cal.4th 353, 360.) Raymond contends that, under *Ibarra*, this court should look for implicit coercion, focusing on prosecutorial benefit, proportionality of the proposed penalty and other factors. But *Ibarra* adopts a framework for analyzing whether an *accepted* plea offer was coercive, not whether a *rejected* offer should have been modified before it was withdrawn.

---

[5] Raymond apparently refused, off the record, to testify against his brother. He filed a motion to strike prior felony convictions for sentencing purposes under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. In opposition, the prosecutor wrote that Raymond "could have severed out of the case if he testified truthfully about his and his co-conspirator[']s actions."

14

(*Ibarra, supra,* 34 Cal.3d at p. 288 [requiring inquiry into totality of circumstances when coercion is alleged after package-deal plea is taken].)

Raymond cites *Bordenkircher v. Hayes* (1978) 434 U.S. 357 [54 L.Ed.2d 604], but that case does not assist him.  That opinion explained, "by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty."  (*Id*. at p. 364 [54 L.Ed.2d at p. 611].)  Plea bargaining does not violate due process "so long as the accused is free to accept or reject the prosecution's offer."  (*Id*. at p. 363 [54 L.Ed.2d at pp. 610-611].)  But due process does not mandate that defendant be permitted to accept a deal on terms that were not offered.  The prosecutor did not have a constitutional duty to offer or accept the terms that Raymond desired.  (See *In re Alvernaz* (1992) 2 Cal.4th 924, 943 [mandatory reinstatement of a plea bargain offer is "inconsistent with the legitimate exercise of . . . prosecutorial discretion"].)

B

Raymond next contends his punishment was cruel and/or unusual in violation of the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution, because his sentence amounts to life without the possibility of parole and he was a teenager at the time of the crimes.  The record shows he was almost 20 years old at the time of the offenses.

The cruel and unusual punishment clause of the federal Constitution prohibits inherently barbaric punishments and those that are disproportionate to the crime. (*Graham v. Florida* (2010) 560 U.S. 48, 59 [176 L.Ed.2d 825, 835].)  Similarly, a prison sentence violates the California Constitution if it is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424, fn. omitted.)  The defendant

15

bears the burden to prove that a sentence is cruel and/or unusual. (*People v. King* (1993) 16 Cal.App.4th 567, 572.)

Raymond does not compare his punishment to that of other adults. Rather, he relies on *People v. Mendez* (2010) 188 Cal.App.4th 47 (*Mendez*), a case involving a 16-year-old gang member sentenced to what amounted to life without the possibility of parole for assault, robbery and carjacking. (*Id.* at p. 50.) The defendant in *Mendez*, along with fellow gang members, confronted victims at night; they brandished a loaded gun to demand and take personal belongings, but they did not personally inflict physical injury or discharge the gun. (*Id.* at p. 65.) Relying on *Graham v. Florida, supra,* 560 U.S. 48 [176 L.Ed.2d 825], the court in *Mendez* held that a de facto life without the possibility of parole sentence is an unconstitutional sentence for any juvenile who has not committed murder. (*Mendez, supra,* 188 Cal.App.4th at pp. 64-67.)

Raymond was born on February 25, 1989. He was two-and-a-half months shy of his twentieth birthday on December 11, 2008, the night of the crimes. The categorical rules applicable to cruel and/or unusual punishment in the context of juvenile sentences do not apply to defendants even a few months older than 18. (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 (*Argeta*).) Raymond acknowledges this, but he nonetheless argues, without citation to authority, that the *Mendez* rationale is still "viable" for him.

As the court in *Argeta* pointed out, our society has chosen to draw a line at the age of 18 to divide childhood from adulthood. (*Argeta, supra,* 210 Cal.App.4th at p. 1482.) The line has been used by the courts, including the United States Supreme Court, in analyzing cruel and unusual punishment; it is a line courts may not ignore. (*Ibid.*) Raymond cites no authority applying the rules applicable to minors to a defendant who was almost 20 years old at the time of the crimes.

It is apparently true that Raymond did not personally carry a gun or cause any physical injury to the robbery victims, but the trial court found he had a lengthy, serious and escalating record of violent offenses. Acknowledging his criminal record, Raymond

16

describes in great detail the facts of one of his prior felony offenses to suggest it was not as serious as the trial court may have believed.  Even assuming the relevance of such facts, Raymond provides no citation to any evidence in the record.  Our review is limited to evidence in the record.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  Raymond also fails to compare his sentence to those of other adults in this or other jurisdictions so that we might conduct a comparative analysis.  He has not met his burden of showing that his sentence constituted cruel and/or unusual punishment.

C

Raymond further contends that his sentences on counts 2, 3, 5 and 6 should have been stayed pursuant to section 654.

Like Vincent, the jury convicted Raymond of, among other things, carjacking (count 1) and kidnapping to commit robbery (count 2).  The trial court sentenced Raymond to 30 years to life in prison for carjacking and life in prison with the possibility of parole for kidnapping to commit robbery.  For the reasons we previously discussed in part I. D, *ante,* we agree with Raymond's contention that his count 2 conviction for kidnapping to commit robbery should be stayed.

Raymond was convicted on count 3 for participation in a criminal street gang. (§ 186.22, subd. (a).)  The trial court orally imposed a sentence of eight months and did not stay the sentence, but the abstract of judgment indicates that the sentence is stayed. The jury's gang findings were used to enhance the punishments on counts 1 and 2.  As the prosecutor acknowledged, those findings could not be used again to "double punish." We agree.  (*People v. Augborne* (2002) 104 Cal.App.4th 362, 377 [enhancements describing nature of offender are imposed only once].)

As to count 5 (the second degree robbery of Serrano -- § 211) and count 6 (the attempted second degree robbery of Andrade -- §§ 211, 664), the trial court stayed the sentences imposed on Vincent because the robberies were necessarily included in count 2, kidnapping for robbery.  But in sentencing Raymond, the trial court imposed a term of

17

one year for count 5 and four months for count 6, staying only the firearm enhancements. We see no basis for such different treatment between defendants in the record or the briefs.

We will modify the judgment to stay Raymond's sentences on counts 2, 3, 5 and 6.

D

Raymond contends there was insufficient evidence to convict him of aiding and abetting the robbery of Jesse charged in count 4.

In reviewing for sufficiency of the evidence, we determine whether, on the whole record, there was enough evidence that a rational trier of fact could find an accused guilty beyond a reasonable doubt, presuming in support of the judgment any facts that could reasonably be deduced from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) We look for evidence that is reasonable, credible, and of solid value, but we do not substitute our assessment of a witness's credibility for that of a fact finder. (*Ibid.*)

At trial, Raymond said he was drunk on the night of the crime; he said he unexpectedly came upon a man he identified as a fellow gang member, so he approached him out of respect and was surprised that the unidentified man forced him at gunpoint to get into Serrano's car. He said he had intended to simply ask for a ride home; he did not know about or participate in any of the crimes; and he had Serrano's telephone when police caught him merely because he had been trying to call his mother. Raymond refused to identify the gunman because he feared for the safety of his family, although he did say it was not his brother.

Jesse said that as he walked up to the car to see Serrano, a man with a red rag over his face held a gun to his head and took $20 from his pocket. Morales said that when Jesse (whom he identified only as the friend Serrano had been waiting for) appeared beside the car, the masked man who had just forced his way into the car got out and harassed Jesse by pointing the gun at him. Jesse did not see anyone in the car other than

Serrano. There was no evidence that Raymond actively participated in the crime, but the jury found both Vincent and Raymond guilty of robbing Jesse.

"All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) Whether a defendant aided and abetted a crime is a fact question and all evidence and reasonable inferences from evidence must be resolved in favor of the judgment. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

To meet the burden of establishing the absence of substantial evidence, a defendant must set forth all material evidence about the disputed element in the light most favorable to the prosecution, then persuade us that the proffered evidence cannot reasonably support the jury's verdict. (*People v. Battle* (2011) 198 Cal.App.4th 50, 62.) Raymond suggests that the robbery of Jesse was just an unanticipated crime of opportunity; and Raymond, like the others in the car at the time, was merely a passive observer. Raymond admits that the evidence was sufficient to show he took part in the other crimes, but contends that this crime was different. We disagree.

Among the factors to be considered in assessing whether someone aided and abetted a crime are "presence at the scene of the crime, companionship, and conduct before and after the offense." (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094.) When evidence demonstrates that a defendant was a " 'party to a compact of criminal conduct,' " even when he does not actively participate in the crimes, he is liable as a principal. (*People v. Phan* (1993) 14 Cal.App.4th 1453, 1463-1464 [quoting *People v. Durham* (1969) 70 Cal.2d 171, 181 and citing facts of that and several other cases].) This is true whether the criminal offenses were prearranged or spontaneous. (*People v. Moore* (1953) 120 Cal.App.2d 303, 306-307.)

Citing *In re Michael T.* (1978) 84 Cal.App.3d 907 (*Michael T.*), Raymond insists that his mere presence was not enough to support his conviction. A juvenile in *Michael T.* was accused of murder but the appellate court said there was uncontroverted

19

evidence that another man committed the murder. (*Id*. at pp. 909, 911.) Some apparently incriminating statements attributed to the juvenile, described by the trial judge as "bravado in seeking peer approval," did not prove that the boy was "admitting guilt for personal participation in the crime." (*Id*. at p. 911.)

*Michael T.* is inapposite. In this case, the jury reasonably rejected Raymond's characterization of himself as drunk and passive, apparently concluding instead that Vincent and Raymond together intended to carjack Serrano's car and to intimidate and rob anyone they encountered in the process.

Raymond admitted belonging to a criminal street gang, walking up to Serrano's car with a fellow gang member and watching while that man pointed a gun at Serrano. Raymond personally forced Andrade into the backseat so he could sit in the passenger seat and, a few minutes later, ran away to avoid being apprehended by police.

Vincent testified that gang members never snitch, never cooperate with law enforcement and get kudos from their peers for committing crimes. It is reasonable to conclude that Raymond supported any and all criminal conduct by his brother that night and that his continued presence in the car while Vincent stepped out to rob Jesse likely kept the others from interfering or escaping. Substantial evidence supports Raymond's conviction for the robbery of Jesse.

### DISPOSITION

The judgment against Vincent is modified to strike the 10-year enhancement for personal use of a firearm on count 4, and to stay the 15-year-to-life sentence on count 2 pursuant to section 654. As modified, the judgment against Vincent is affirmed.

The judgment against Raymond is modified to stay the following sentences pursuant to section 654: the sentence of life with the possibility of parole on count 2, the sentence of eight months on count 3, the sentence of one year on count 5, and the sentence of four months on count 6. As modified, the judgment against Raymond is affirmed.

20

The trial court is directed to prepare amended abstracts of judgment reflecting the judgments as modified, and to send certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

                                                               MAURO                , J.

We concur:

                  RAYE                , P. J.

                  HULL                , J.